**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 17-cv-01239-RM

Mark J. Long,

    *Plaintiff*,

    *v.*

Nancy A. Berryhill, as Acting Commissioner
of the Social Security Administration,

    *Defendant*.

---

# ORDER

---

Defendant Berryhill, Acting Commissioner of the Social Security Administration (SSA), denied Plaintiff Long's application for social security disability insurance benefits (DIB) under Title II of the Social Security Act (Act, 42 U.S.C. § 401, *et seq.*). An administrative law judge (ALJ) ruled that Long was not disabled within the meaning of the Act, and this action comes here on Long's request for judicial review under 42 U.S.C. § 405(g). Before the Court are the entire administrative record (ECF No. 8 with exhibits (cited herein as "R. [page number(s)]")) and the complete briefing of the parties (ECF Nos. 12, 13). The matter is ripe for determination. For the reasons that follow, the Court **AFFIRMS** the denial of Long's DIB.

**I.    BACKGROUND**

Long, a high school graduate born in 1962, worked as a letter carrier for the U.S. Postal Service for 28 years. (R. 56, 62, 109.) In April 2012, he received a hip replacement. (R. 340–41.) In July 2011 and June 2012, he had surgeries to repair both shoulders. (R. 34, 351–59.) On February 12, 2014, he sought DIB, reporting shoulder impairments, degenerative disc disease in

his neck and back, multiple joint arthritis, and severe back pain going back to December 2012. (R. 102, 111, 215.) Before reaching this Court, Long filed a DIB claim and had a hearing before an ALJ. Ultimately, the SSA determined he was not disabled and therefore not entitled to DIB. (R. 25–48, 102–11.) In support of his claim, Long provided documentation from several medical providers and his own testimony. A vocational expert also testified before the ALJ.

### a. Jean Bouquet, D.O. (Physician)

Dr. Bouquet has treated Long since July 2009. (R. 432.) On November 21, 2012, Long reported lower back pain, for which he received Oxycodone. (R. 406.) On December 27, Dr. Bouquet diagnosed peripheral neuropathy and left olecranon bursitis, injected Long's left elbow with Kenalog, and prescribed Cymbalta, which Long found helpful with the pain. (R. 388–89, 405.) On January 31, 2013, Long reported pain in his shoulders, hip, and lower back. Dr. Bouquet performed an exam, which revealed paravertebral spasms in the lumbosacral area, and diagnosed degenerative disc disease of the lumbar spine. He prescribed Oxycodone. (R. 404.)

On March 18, 2013, Long returned for medication refills, at which time he stated that he was sweating on Cymbalta, but that it was working well and his pain was well-controlled. (R. 403.) One month later, the doctor stopped Cymbalta because Long reported ringing in his ears but re-prescribed Lunesta for sleeplessness. (R. 402.) On June 11, Long returned reporting heightened activity and resulting increased back pain, for which he again received Oxycodone. (R. 400–01.) Two weeks later, he was back for his shoulder pain. (R. 399.) On August 12, Dr. Bouquet assessed opioid dependency, stress, and neck and shoulder pain, for which Long received additional Oxycodone. (R. 398.) Long returned on September 9 for lower back, shoulder, and neck pain but received no additional medication. (R. 397.)

On November 12, 2013, Long reported morning stiffness "that disappears after a few." Dr. Bouquet assessed lower back pain and osteoarthritis and prescribed more Oxycodone. (R. 396.) On December 17, Long continued to recount "generalized joint/back pain not currently well-controlled" that increased with cold weather. At this point, the doctor discontinued Oxycodone to see if the pain and fatigue could be well-controlled with Tramadol. (R. 395.) On January 8, 2014, Long received refills. (R. 394.) On March 4, Long came back with more reports of pain in the neck (while driving) and back that prevented him from sitting in chairs and made getting up in the morning difficult. He also "couldn't get up at [the] avalanche game." Dr. Bouquet noted the same type of pain discussed above, re-prescribed Oxycodone, and added Oxycontin (R. 393.) The April 2 assessment was similar. (R. 392.)

On May 8, 2014, Mr. Long stated his pain was "stable" over the previous month, but he had increased fatigue during the day and did more sitting and watching television than usual. Dr. Bouquet prescribed OxyContin, Oxycodone, and Alprazolam. (R. 418). The next month, Long stated he was in "a lot of pain." It was "[n]othing out of the ordinary [and] getting a little better." He had "[s]ome withdrawals" and "not a good month." He added that he had applied to be a police dispatcher. (R. 417). On July 22, Long complained of left-sided low back pain radiating to the scapula and right hip pain. Dr. Bouquet assessed straight leg, raising on the right, and added Prednisone to Long's other medications. (R. 416.) On September 22, Long relayed more low back pain radiating up to the neck. His medications were refilled on November 18, 2014 ("[Patient] states that the medications are working well") and January 15, 2015 ("was in a quarry swimming"). (R. 414–15.)

On January 15, 2015, Dr. Bouquet filled out a "Disability Impairment Questionnaire" provided by Long's counsel. (*See* R. 432–36.) In it, the doctor reported diagnoses of

3

degenerative disc disease of the lower spine, degenerative joint disease of the right hip, and degenerative joint disease of both shoulders—all supported by "MRI findings." (R. 432.) He described the pain as a "dull ache" that occurred daily, which was aggravated by sitting, driving and exertion. Other than the medications described above, Dr. Bouquet reported Long's additional treatments of hip replacement, bilateral shoulder surgeries, and physical therapies. (R. 433.) According to Dr. Bouquet on this form, Long could not sit or stand for more than one hour in an 8-hour workday, it was medically necessary for Long to avoid continuous sitting, he would need to get up every hour for at least ten minutes, and he could never lift or carry any weight (even 0–5 pounds). (R. 434.) The form opines that Long could "never/rarely" grasp, turn, and twist objects; use hands or fingers for manipulation; or use arms for reaching. He would need to take unscheduled breaks every thirty-to-sixty minutes for at least thirty minutes and would have to be absent from work more than three times per month. (R. 435–36.)

On March 10, 2015, Long reported continued low back and neck pain, and Dr. Bouquet substituted Opana for OxyContin and Oxycodone. (R. 479.) The doctor refilled the medications on April 7, 2015. (R. 478.) On April 28, 2015, Long reported new right knee pain, and a subsequent MRI revealed evidence consistent with a chronic tear. (R. 469–70, 477.) At a follow-up on August 4, 2015, Long stated he was having problems with dropping objects. (R. 474.)[1]

On November 19, 2015, Dr. Bouquet completed a second "Disability Impairment Questionnaire," which contained largely the same information as the first except Long could now "occasionally" lift and carry up to, but never more than, ten pounds. (R. 503–07.)

---

[1] The Court has difficulty reading the precise handwritten date (likely Oct. 7, 2015), but at least one of Dr. Bouquet's reports indicates that Long's admission that the "medications make him feel functional." (R. 496.) The Court also notes that Long reports varying degrees of side-effects with his various medications. (*Compare, e.g.*, R. 414, 496 (no side effects) *with* R. 398, 403–04, 415 (noting side-effects such as vivid dreams, ear-ringing, and sweating).)

4

### b. Dr. Genuario, M.D. (Orthopedic Surgeon)

On June 7, 2011, Dr. Genuario examined Long and reported tenderness in the neck, tightness in both trapezii, tenderness over the greater tuberosity on the left (none on the right), mild tenderness over the biceps, full motion, impingement signs on the left, cuff strength limited by pain, but 4+/5 with supraspinatus testing. (R. 331.) Long had left shoulder surgery shortly thereafter, right shoulder surgery on June 28, 2012, and initially followed up with Dr. Genuario on July 9, August 6, August 20, September 19, October 10, October 22, November 12, and December 10. Notes from this period indicate markedly improved range of motion, good strength, some stiffness, tiredness and achiness with long walks, aggressive physical therapy, and—at the end of that time frame—some limited work of two hours per day that the doctor planned to continue. (R. 301–10.) By March 15, 2013, Long showed "excellent range of motion . . . [and] continued clinical improvement, but still marked limitation with overhead activities and repetitive duty." (R. 300.)

On October 23, 2013, Dr. Genuario saw Long for complaints of increasing pain and numbness and documented trace tenderness of the right bicipital groove, forward flexion to 165 degrees bilaterally, weakness of 4/5 on the right compared to 4+/5 on the left with empty can test, and discomfort with internal range of motion to T12 bilaterally. (R. 365.) On November 4, reviewing a recent MRI, Dr. Genuario noted mild joint degenerative changes and recommended a home exercise program because Long stated "overall the pain in his shoulder is not significant[] enough to look at doing a cortisone injection at this point." (R. 298.)

### c. Dr. Stanley, M.D. (Orthopedic Surgeon)

Dr. Stanley evaluated Mr. Long on January 17, 2013 for symptoms related to his back and neck pain. As Dr. Stanley reports, "On examination, [Long] has 5/5 strength throughout his

5

upper and lower extremities. Muscle tone is normal. Deep tendon reflexes and sensation are symmetric. He does have pain on palpation centrally and paraspinally and the base of his neck as well as the base of his low back." Dr. Stanley diagnosed severe degenerative disc disease in the cervical spine at C4-5 and C5-6 with foraminal stenosis and lumbar spine degenerative disc disease at L1-2 and L2-3 based on a December 11, 2012 MRI. (R. 388.) Dr. Stanley's report on March 15, 2013 is nearly identical. (R. 389.)

### d. Dr. Westerman, D.O. (Physician)

Dr. Westerman evaluated Mr. Long for joint pain on December 11, 2013. (R. 369.) The physical examination reflects "painless arc of motion in all planes, no crepitance," "no paraspinous muscle tenderness, no tender or trigger points found," and normal degree of lordosis present" for the cervical spine; "no deformities present," full painless arc of motion and normal chest expansion," and "no vertebral or costo vertebral angle percussion tenderness" for the thoracic spine; "no deformities," "no percussion tenderness or tender trigger points, "full range of motion in all planes [and] no pain on ROM," and "straight leg raise test negative, FABER test negative bilaterally" for the lumbar spine; "no tenderness [or] swelling," "range of motion: full and painless in all planes," "no joint instability," "no evidence of impingement," and a 5/5 for strength for his shoulders; "no tenderness [or] swelling," "range of motion: full and painless in all planes," "knee stable," and "McMurray's sign negative [and] patella apprehension test negative" for his knees; and normal walking gait and station. (R. 371–73.) Despite these findings, Dr. Westerman assessed Long with rotator cuff syndrome, degenerated lumbar disc, cervical spondylosis, and chronic pain syndrome. (R. 375.) Long's March 12, 2014 visit with this doctor had no substantially different conclusion. (R. 374–76.)

6

### e. Dr. Henke, M.D. (Occupational Medicine Specialist)

At the request of his counsel, Dr. Henke evaluated Long on September 24, 2015 and reviewed records from Drs. Bouquet, Genuario, Stanley, and Westerman, and the MRIs (R. 462–65.) From his physical examination—which revealed "diffuse tenderness to palpation over the entire posterior cervical spine, with paraspinal vertebral muscle spasm but no trigger points" and a positive impingement sign on the right shoulder—Dr. Henke assessed degenerative joint disease of the cervical and lumbar spine and noted that Long had undergone operations on his shoulders and hip. Dr. Henke also noted that Long's "gait was slow but non-antalgic. He could perform tandem walking forward and reverse without support." (R. 466.) Dr. Henke also filled out a Disability Impairment Questionnaire. (*See* R. 457–61.) In it, the doctor reported these same diagnoses and indicated that Long could not sit or stand for more than one hour in an 8-hour workday, it was medically necessary for Long to avoid continuous sitting, he would need to get up every hour for at least fifteen minutes, and he could never lift or carry any weight (even 0–5 pounds). (R. 459.) The form opines that Long could "never/rarely" grasp, turn, and twist object; use hands or fingers for manipulation; or use arms for reaching. He would need to take unscheduled breaks every thirty minutes for at least thirty minutes and would have to be absent from work more than three times per month. (R. 460–61.)

### f. Long's Testimony

On November 18, 2015, Long testified before the ALJ. According to him, he has pain in his neck and lower back and stiffness in the morning. (R. 71–72.) He estimated that standing more than thirty minutes or walking two to three blocks is difficult. (R. 75.) He maintains that using his arms is demanding, citing a time it took him three days to paint a door because he could only do it for ten-to-fifteen-minute intervals. (R. 62–63.) He testified that he frequently drops

objects from his hands and has difficulty reaching—but only if he has to reach out to the side or in front of him higher than shoulder-level. (R. 64–67.) Long stated it is difficult for him to lift a gallon of milk. (R. 82.) He does not sleep well at night and sometimes falls asleep during the day. (R. 70–71). Now that he is not working, he "watch[es] a lot of TV" and will not drive "unless I have to." (R. 69.) He occasionally goes to the shooting range for one or more sessions of ten-to-fifteen-minutes and can make himself simple meals, such as soup or a sandwich. (R. 67, 69.) He also testified that he applied for a job as a police dispatcher and was interested in a 9-1-1 operator job, wrapped and packed items for a move, and traveled to California by plane. (R. 78–81.) He has some difficulties dressing himself. (R. 66.)

### g. Vocational Expert Testimony

A vocational expert testified that Long's previous role as a letter carrier is a medium job with a skill level of four. (R. 92.) The expert continued that an individual of Long's age, education, and work history—who was limited to occasionally lifting and carrying twenty pounds and frequently ten pounds; standing or walking for six hours and sitting for six hours in an eight-hour workday; could only frequently operate hand controls with upper extremities; should never crawl or climb ladders, ropes, or scaffolds; can frequently stoop, kneel, crouch, and climb ramps or stairs; could only occasionally reach overhead but frequently reach in all other directions; and could undergo no more than occasional exposure to vibration—could not perform Long's past work. (R. 92–93.) However, the expert made clear that such an individual could perform other light work as a cashier, furniture rental consultant, or marking clerk. (R. 93.) If the individual was further reduced to never reach overhead—or additionally limited to frequent handling, fingering, and feeling—he could still perform these light jobs. (R. 95.)[2] However, if the

---

[2] The expert went on to testify to the number of these light jobs in the national economy (*see, e.g.*, R. 93), and whether or not there is a significant number of these jobs is not at issue between the parties.

8

individual was additionally limited to standing and walking no more than two hours a day—or was limited to occasionally lifting and carrying ten pounds and frequently lifting and carrying less than ten pounds—he could not perform any light work. (R. 93–94.) The expert stated Long has no skills that transfer to any sedentary work. (R. 94.)

## II. THE COMMISSIONER'S DETERMINATION

### a. Legal Standard for a Finding of Disability

The legal standards applicable here are not in dispute. To obtain DIB, a claimant must meets the insured status requirements, be younger than 65 years of age, file an application for a period of disability, and have a "disability" within the meaning of the Act. 42 U.S.C. §§ 416(i), 423(a); *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The disability must also have begun before expiration of the disability-insured status. 20 C.F.R. § 404.101; Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *8 (1983). Relevant here, a person has a disability

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). To qualify for benefits, the disabling impairment must last—or be expected to last—for at least twelve months. *Barnhart v. Walton*, 535 U.S. 212, 214–15 (2002). Evaluating the existence of a disability is a five-step, sequential process that ends at any point at which the claimant is found not disabled. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991) (citation omitted).

***First***, the claimant must demonstrate that he or she is not currently involved in any substantial, gainful activity. 20 C.F.R. § 404.1520(b). ***Second***, the claimant must show a medically severe impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work activities. *Id*. at § 404.1520(c). ***Third***, if the impairment matches or is equivalent to an established listing under the governing regulations, the claimant is judged conclusively disabled. *Id*. at § 404.1520(d). If the claimant's impairment does not match or is not equivalent to an established listing, the analysis proceeds to the fourth step. *Id*. at § 404.1520(e). ***Fourth***, the claimant must show that the "impairment prevents [him or her] from performing work [he or she] has performed in the past." *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988) (citations omitted); *accord* 20 C.F.R. § 404.1520(f). ***Fifth***, the Commissioner must demonstrate: (1) that based on the claimant's residual functional capacity, age, education, and work experience, the claimant can perform other work; and (2) the work that the claimant can perform is available in significant numbers in the national economy. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987) (citation omitted); *see also* 20 C.F.R. § 404.1520(g).[3]

According to the "treating physician rule," the SSA Commissioner will generally give more weight to medical opinions from treating sources than those from non-treating sources. 20 C.F.R. § 404.1527(d)(2). "In deciding how much weight to give a treating source opinion, an ALJ must first determine whether the opinion qualifies for 'controlling weight.'" *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). To make this determination, the ALJ:

> must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. [I]f the opinion is deficient

---

[3] Long has raised no challenge concerning the availability of light work matching the descriptions provided by the ALJ in the national economy.

10

> in either of these respects, then it is not entitled to controlling weight.

*Id.* (quotations omitted); *see also* § 404.1527(d)(2) (noting that although the SSA will consider evidence from treating medical sources, the final responsibility in deciding these issues remains with the Commissioner). Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference" and must be weighed using the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1301 (quotation omitted). Finally, "[u]nder the regulations, the agency rulings, and our case law, an ALJ must give good reasons . . . for the weight assigned to a treating physician's opinion," that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Id.* at 1300 (quotations omitted). "[I]f the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." *Id.* at 1301 (quotations omitted).

Finally, the ALJ's responsibility to explain his decision concerning the evidence extends to any evaluation of a claimant's credibility:

> According to Social Security Ruling 96–7p, 1996 WL 374186 (July 2, 1996), which governs an ALJ's evaluation of a claimant's description of symptoms, the evaluation must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations. It is well-established that an ALJ's findings with respect to a claimant's

credibility should be closely and affirmatively linked to substantial
evidence and not just a conclusion in the guise of findings.

*Hardman v. Barnhart*, 362 F.3d 676, 678–79 (10th Cir. 2004) (internal quotations omitted).

### b. The Commissioner's Decision

On March 10, 2016, based on his review of the medical records and testimony discussed above, and using the analytical framework set forth above, the ALJ found that Long did not qualify for DIB because he did not have a disability within the meaning of the Act. (*See* R. 25–48.) **First**, the ALJ noted that Long meets the insured status requirements at step one. (R. 30.) **Second**, the ALJ found that that Long had the following severe impairments: degenerative joint disease of the lumbar spine, mild cervical degenerative disc disease, degenerative joint disease of the left shoulder, right hip status-post replacement, osteoarthritis of the right shoulder and knee, peripheral neuropathy, and obesity. (R. 31.) But **third**, the ALJ did not find these impairments or any combination thereof to equal the severity of one of the established regulatory listed impairments. (R. 31.) **Fourth**, the ALJ was confident that Long could not perform any relevant past work. (R. 40.) However, **fifth**, he found that Long had the residual functional capacity to perform "light work" as defined in 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.").

In making a determination of sufficient residual functional capacity for light work, the ALJ provided an extensive recount of the medical records discussed above, evaluated the record, and made certain credibility determinations. Notably, he found Long "not entirely credible" because "the complaints are not all that consistent throughout the record." (R. 33, 37.) He gave

Dr. Bouquet's and Dr. Henke's ultimate conclusions "very little weight" because the former doctor's "own treating source records [ ] are largely devoid of any abnormal findings" and the latter's "minimal physical findings on examination [ ] are internally inconsistent [with his bottom-line conclusion.]" (R. 39–40.) He concluded:

> In sum, the above residual functional capacity assessment is supported by the objective medical evidence contained in the record. Treatment notes in the record do not sustain the claimant's allegations of disabling pain. . . . [H]is treating source statements are so horrifically unsupported that they warrant almost no weight at all. The credibility of the claimant's allegations is reduced by his wide range of activities of daily living, conservative treatment, and the effectiveness of medications. While I acknowledge that the claimant does experience some levels of pain and limitations, it is only to the extent described in the residual functional capacity above.

(R. 40.)

On March 24, 2016, Long submitted a request for review of the ALJ's decision to the Appeals Council. (R. 23.) On May 13, 2016, Dr. Bouquet sent a letter to Long's counsel indicating his disagreement with the ALJ's determination (attaching medical records from April 2016) and re-iterating his assessment that "Long is permanently and totally disabled." (R. 18–21.) On March 22, 2017, the Appeals Council—having reviewed these additional materials—denied Long's request for review. (R. 1–4.)

## III. ANALYSIS

### a. Standard of Review by the District Court

Reviewing DIB denials, district courts decide whether "substantial evidence" supports the factual findings and whether the correct legal standards were applied. *Wall v. Astrue*, 561

F.3d 1048, 1052 (10th Cir. 2009). Here, the correct legal standards were applied,[4] so the only question is whether substantial evidence supports the findings of fact.

Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* "It requires more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A district court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met," but will "not reweigh the evidence or retry the case." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007); *see also* 42 U.S.C. § 405(g). Evidence is not substantial if it is overwhelmed by other evidence in the record. *Grogan v. Barnhart*, 399 F.3d 1257, 1261–62 (10th Cir. 2005). But courts may not reweigh the evidence or substitute their judgment for that of the agency. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006). Any fact, "if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).

### b. Long's Challenges to the Commissioner's Findings

Long asks this court to reverse the Commissioner's DIB denial for failure to properly weigh the medical evidence, evaluate his own credibility, and of the Appeals Council to consider new material evidence.

Beginning with the last protest, Long is correct that the Appeals Council "must consider evidence submitted with a request for review if the additional evidence is (a) new, (b) material, and (c) relate[d] to the period on or before the date of the ALJ's decision." *Chambers v.*

---

[4] As discussed more below, Long does not suggest that the SSA applied the wrong legal standards but, rather, reached the wrong result. Also, as Defendant points out, SSR 96-7p—on which the ALJ relied in his evaluation—was superseded by SSR 16-3p in March 2016. *See Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Oct. 25, 2017). The parties agree, however, that the Court should base its review on SSR 96-7p (*see* ECF No. 12, at 20; ECF No. 13, at 15) because the earlier ruling was in effect at the time of the ALJ's decision.

14

*Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004). But the only materials he argues the Appeals Council should have considered were those submitted by Dr. Bouquet on May 13, 2016 and which—to the extent they do not contain the identical conclusions contained in his earlier records—pertain to medical evaluations performed on April 4, 2016. But the ALJ made his decision on March 10, 2016, making this information not related to the period on or before the ALJ's decision. The balance of the material is best described as either frustrated argument—which would not have been material to the Appeals Council's task—or a restatement of previous conclusions without additional pre-decision evidentiary support. This argument fails.

Long also contends that the ALJ improperly undervalued his more favorable doctors' conclusions. And going too far, the ALJ did in fact accuse Dr. Bouquet and Dr. Henke of authoring contrived conclusions for the sole purpose of getting Long benefits. (*See* R. 40.)[5] Moreover, the ALJ favored the agency medical evaluation, even though the relevant report did not involve a physical examination.[6] But Long latches onto these circumstances to the exclusion of the variety of legitimate reasons and explanations the ALJ provided for affording these doctors' ultimate conclusions lesser weight. Dr. Bouquet treated Long for several years and reviewed MRI results with him showing shoulder and knee tears. And there is little doubt that Dr. Bouquet correctly diagnosed mild degenerative disc disease.[7] But the records reflect that Long only complained of abnormal pain on several isolated occasions and, for the most part, Dr. Bouquet's consistently prescribed assortment of medication enabled him to successfully manage

---

[5] For example, the ALJ could not help but to mention that "Dr. Henke's report was a representative-referred evaluation for the sole purpose of generating medical opinion evidence in support of the claimant's application." (R. 40.)

[6] Long argues that the ALJ should have given less weight to the opinion of Dr. Medina, M.D., who is a state agency medical consultant that reviewed reports, including from Dr. Bouquet and Dr. Westerman, and concluded that Long would not be able to perform his prior work but was nevertheless not disabled because he had the residual functional capacity for light work. (*See* R. 102–11.) The Court does not find Dr. Medina's involvement in this case necessary to its present analysis.

[7] The ALJ did not disagree with this conclusion, which is supported by an October 2011 MR. (R. 34.)

his pain. Moreover, Dr. Bouquet's records reflect that Long was doing housework, including packing up incident to a move, and had applied to work as a 911 operator. For his part, Dr. Henke examined Long once at counsel's request. His physical examination revealed that Long had some tenderness in the neck but was able to raise both arms well above 90-degrees and could walk around with no support. But despite these limited findings, as the ALJ recognized, on survey forms provided by Long's counsel, both doctors concluded that Long "must essentially remain in bed for at least 18 hours per day, can never use his hands for any activity, [and] can essentially never lift objects of any weight." (R. 40.) Based on the findings of other examining doctors and portions of Long's own testimony discussed more below, the ALJ was within his bounds to afford these ultimate conclusions by Dr. Bouquet and Dr. Henke relatively little weight. The Court is not convinced that either of their conclusions is well-supported, even by their own pre-"Disability Impairment Questionnaire" documentation.

In addition to the records from Dr. Bouquet and Dr. Henke, the ALJ also marched through those from other medical professionals that personally examined Long. Dr. Genuario confirmed that Long had increasing-to-full range of motion, some impingement on the right shoulder, and some mild degenerative changes, but was otherwise healing well. Dr. Genuario's records also confirm Long's denials of any numbness or tingling, and, while he had some pain, he still would be attempting home exercise and did not require a cortisone injection. Dr. Stanley's records, despite noting some cervical and lumbar spine pain, reflect full strength in both the upper and lower extremities and Long's statement that his medications proved helpful, including for his lower back complaints. Finally, Dr. Westerman's evaluation is telling. Long had presented for pain evaluation related to his degenerative changes, but the physical exam revealed painless arc of full motion without tenderness or instability and full strength in every

16

evaluated body location—including the neck, shoulders, back, knee, hands, wrists, and elbows. Long also walked normally. Thus, these evaluations cast serious doubt upon the conclusions of nearly utter immobility ultimately provided by Drs. Bouquet and Henke.

Finally, Long argues that the ALJ failed to properly evaluate his own credibility, principally regarding his argued inability to stand or walk. (ECF No. 12, at 20.) Apparently, this limitation is supported by the potentially untrustworthy conclusions discussed above and Long's own testimony that it is painful for him to walk more than two or three blocks. But like the ALJ, the Court has difficultly bearing this limitation out. At the very least, the rest of Long's own testimony admits several daily activities that would involve substantial walking—including going to the shooting range, swimming at a quarry, and doing chores around the house.

## IV. CONCLUSION

Considering the entire record together with the analysis of the ALJ, the Court would have difficulty finding Long disabled by a preponderance of the evidence, were that its task. But without difficulty, the Court finds that the ALJ's reasoning and conclusion were based on substantial evidence. A reasonable mind may certainly accept that Long had the residual functional capacity to perform light work—a conclusion which is not overwhelmed by conflicting evidence on the record. Ultimately, the Court would be required to reweigh the evidence in order to reverse the ALJ. This the Court cannot do. Based on the foregoing, the Court **AFFIRMS** Defendant's denial of disability insurance benefits.

DATED this 10th day of May, 2019.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge